PETERS, Administratrix, Respondent, vs. NATIONAL SURETY
COMPANY, Appellant.

*December 7, 1917—April 3, 1918.*

*Contracts: Construction: Failure of . contractors for government
work: New contract with surety: Subletting: Assignment: Ex-
tent of surety's liability: "Hold-backs" and penalties under
original contract: Use of original contractors' plant: Superior
claims: Deductions by government for materials, etc., bought by
it: Waiver of claim: Admissions: Engineer's certificate as to
completion of work: Duty to obtain: Discharge of liens, etc.:
Condition precedent to action: Expense of collecting moneys
from government: Counterclaim: Action, who may maintain:
Partnership between corporation and individual: Dissolution
of corporation: Interest, from what time computed.*

1. O. & C., after partially completing certain work which they had
   contracted to do for the United States government, became
   bankrupt, and the government, under the contract, took posses-
   sion of the work and of all materials, tools, animals, etc.,
   which the contractors had been using thereon. Defendant
   company, which was surety on the bond of O. & C., thereafter
   made with plaintiffs the contract in suit, which was to be ef-
   fective only in case defendant should make, as it in fact did, a
   new contract (known as the Garfield contract) with the gov-
   ernment for the completion of the work by defendant in ac-
   cordance with the original contract of O. & C. but with an ex-
   tension of time. The contract in suit provided that plaintiffs
   should complete the work begun by O. & C. in the same manner
   as if they had been the original contractors, and that "the
   moneys to be paid" to them "therefor shall be the sum or bal-
   ance to be paid by the United States under the contract of" O.
   & C., "which sum or balance is understood to be $641,137.34, to
   which is to be added and paid by the United States" certain
   "hold-backs" (*i. e.* percentages reserved when payments were
   made to O. & C.) aggregating $45,000, and certain penalties
   (incurred by O. & C. for delays) aggregating $7,050; "and the
   further sum of $14,050 to be paid by the" defendant to plaint-
   iffs. It was provided that defendant should assign all war-
   rants and pay over to plaintiffs all money received by it from
   the United States upon estimates of work done and for hold-
   backs and penalties, and, in addition, pay to plaintiffs "the sum
   of $14,050 and no more, which latter sum shall be in full for all
   other obligations and liabilities" of the defendant to the plaint-

iffs; and that it was the true intent of the parties that plaint-
iffs should "look to the payments to be made by the United
States for their compensation," and that defendant should not
be liable to plaintiffs for any greater sum than $14,050. *Held*,
that defendant assumed an absolute liability to plaintiffs for
the sum of $14,050 only, and not for the balance unpaid by the
government on the contract of O. & C. or for the hold-backs or
penalties, but that defendant was not a mere trustee for plaint-
iffs or a mere conduit through which the money paid by the
government was to pass to them, and was bound to use reason-
able diligence to collect moneys due to it under the Garfield
contract; and that each party was bound to assist, whenever
necessary, in taking the required steps to obtaiL the amount
which the government was willing to pay for the work as it
went on or which should finally become due on the completion
of the work.

2. Plaintiffs were not mere assignees of the Garfield contract be-
tween defendant and the government, an assignment of such a
contract being prohibited by the federal statute; and neither
party can be heard to assert that there was in effect such an
assignment.

3. Upon the evidence showing that plaintiffs received and retained
without protest a copy of said Garfield contract between defend-
ant and the government, it is *held* that they were chargeable
with knowledge of its contents, and cannot be heard to say that
they relied upon telegrams from defendant which might have
led them to a different understanding as to its contents.

4. The Garfield contract not having provided in any way that the
government would pay to defendant the penalties of $7,050
which had been incurred by O. & C., and there having been no
suggestion on the part of the government that it would pay or
remit said penalties, and plaintiffs not having, prior to the
final settlement between the government and defendant under
said contract, suggested or demanded that defendant require
such a favor from the government, the defendant is not liable
to plaintiffs for the amount of such penalties.    Defendant can-
not be held so liable on the speculative theory that such a favor
might have been granted if some one had asked for it.

5. By the Garfield contract the government permitted defendant to
have the possession and use of the material, tools, animals, etc.,
which had been used on the work by O. & C., and by the con-
tract in suit defendant agreed that plaintiffs might have the
use, without charge during the progress of the work, of said prop-
erty of O. & C. of which the government had taken possession,
and further agreed that it would protect and defend plaintiffs

against a superior claim on the part of any other person affect-
ing the possession of any of said property. Afterwards one Y.
claimed to be the owner of a part of the property so turned over
to plaintiffs, and after some controversy in which the govern-
ment declined to take any part, and after defendant had denied
any responsibility in the matter, plaintiffs bought from Y. the
property claimed by him and thereafter sold part of it so that
the net cost to them was $4,469.47. *Held* that, construing the
contract in the light of the evidence, defendant's guaranty to
plaintiffs of possession and use was not limited to property
actually owned by O. & C., but extended to the property in ques-
tion which was in the possession of and used by O. & C. and
was afterwards taken possession of by the government; and
hence that defendant was properly held liable for the net cost
to plaintiffs of the Y. property.

6. Defendant having elected to deny all responsibility in the matter
of Y.'s claim, was bound by such election and was not there-
after entitled to have the plaintiffs tender to it the defense of
any lawsuit between them and Y.

7. After the government had taken possession of the work left in-
complete by O. & C. it continued such work for a time and pur-
chased further materials and supplies, some of which were at
the work and were turned over to plaintiffs after the contract in
suit was made. Both plaintiffs and defendant assumed that
these were a part of the plant, but a deduction therefor was
made by the government in the first statement or estimate
upon which a payment was made to defendant under the Gar-
field contract, and the same item appeared as a deduction in
the subsequent estimates. A finding of the trial court that
the claim of the government as to this property was a superior
claim against which defendant had agreed to protect plaintiffs,
and its conclusion that defendant was liable for the amount so
deducted by the government, are *held* to be sustained by the
evidence.

8. Mere tacit acquiescence by plaintiffs in said deduction so far as
the government was concerned in its dealings with defendant
under the Garfield contract did not amount to a waiver of their
claim as against the defendant under the contract in suit.

9. An unqualified admission by defendant of a liability as to both
of the items above mentioned (the property claimed by Y. and
the deduction made by the government), although not for the
full amounts claimed by plaintiffs, was a substantial ground
for the findings and conclusions of the trial court in respect to
said items.

10. The filing, with the government, of a certificate of the govern-

ment engineer as to the completion of the work, though required by the Garfield contract and by the original contract with O. & C., was not a condition precedent to defendant's liability, under the contract in suit, to make payments to plaintiffs. The requirement as to such certificate was for the protection of the government, and the duty to obtain it rested primarily upon the defendant.

11. Although by the contract in suit plaintiffs agreed to pay for all materials, labor, and supplies furnished or used in the work and to discharge any attachments or liens therefor, such payment and discharge was not a condition precedent to their right to maintain this action for the balance due them under the contract; the defendant having ample security by withholding funds sufficient to cover the unpaid claims, or by requiring the claimants to be made parties to the action.

12. Upon completion of the work, the government officials decided that the hold-backs above mentioned should properly be paid to the trustee in bankruptcy of the original contractors, O. & C. Thereupon defendant, after consultation with plaintiffs, brought and successfully prosecuted an action to recover such hold-backs, and the amount thereof was paid to it as provided in the Garfield contract. *Held*, that the steps so taken by defendant to obtain said moneys were a part of its obligation to the plaintiffs and that it was not entitled to have the expenses incurred in prosecuting said action allowed to it as a counterclaim against the plaintiffs.

13. A corporation and an individual together contracted to do certain work. After the work had been completed and after an action by both the corporation and the individual as plaintiffs had been brought against the other party to the contract for a balance due thereon, the corporation was dissolved and three years later, under sec. 1764, Stats., ceased to be a body corporate for any purpose. Thereafter the individual plaintiff died, and the action was revived in the name of his administratrix as sole plaintiff. *Held*, that whatever interest and ownership there was in the funds in question passed on the death of the corporation, as it would have passed on the death of an individual copartner, to the surviving partner, so far at least as the defendant was concerned, and that the amount recovered in the action is properly payable to the plaintiff administratrix.

14. For the collection by defendant of the amounts due from the government upon completion of the Garfield contract and payment thereof to plaintiffs, thirty days after the final estimate is *held* to be a reasonable time, and defendant should not be held liable for interest upon said amounts prior to the expiration of said thirty days.

15. As to the deduction made by the government, as above stated, in
    the estimates under the Garfield contract, on account of "sup-
    plies and materials purchased by the United States and turned
    over to" defendant, the language of such item did not neces-
    sarily, as a matter of law, notify defendant that such a deduc-
    tion was a superior claim against the property turned over to
    plaintiffs, for which it must be responsible under the contract
    in suit, or that it must forthwith pay such sum to plaintiffs in
    order to avoid liability; and no demand for the payment of said
    sum having been made by plaintiffs prior to the commencement
    of this action, defendant should be charged with interest there-
    on only from the date of such commencement.

    ESCHWEILER and KERWIN, JJ., dissent in part (on motion for
    rehearing).

APPEAL from a judgment of the circuit court for Rock
county: GEORGE GRIMM, Circuit Judge. *Modified and af-
firmed.*

The defendant was surety on a bond of $120,000, given to
the United States government to secure proper performance
by the firm of Orman & Crook on work to be done on a large
dam and distribution canals called the Belle Fourche project
in South Dakota under a contract made in November, 1905.
The contractors carried on that work until they went into
bankruptcy in January, 1908. The United States govern-
ment, under the conditions of that contract, took possession
of the work and all the tools and materials that had been
used by the contractors on said work and continued to carry
it on for a time. The defendant, to relieve itself as much as
possible from its obligation under the bond, undertook to
find some contractor experienced in such class of work to
complete the contract. After negotiations with a number of
contractors, a contract was made on April 2, 1908, between
Hayes Brothers Company, a corporation, and John W. Peters,
both of Janesville, Wisconsin (who are hereinafter, for con-
venience, designated as the plaintiffs). The material parts
of said contract are as follows:

It recited the making of the contract of November 14,
1905, between the United States of America and Orman &

Crook; that the defendant had been surety on the same; attached to and made a part of the contract copies of the advertisements, proposals, specifications in connection with and the contract of Orman & Crook; that the work undertaken by Orman & Crook had been partially completed and that they had gone into bankruptcy and discontinued work; that the United States government had under said contract taken possession of all machinery, tools, appliances, and animals employed on the said work and of all materials belonging to Orman & Crook which had been delivered on the ground; that the secretary of the interior on behalf of the United States government was authorized to employ other parties to carry on the contract and desired the defendant as such surety to complete the contract and is willing to enter into a contract for such purpose upon the defendant furnishing the secretary with satisfactory contractors to complete the said work for the defendant; that plaintiffs have examined the previous advertisements, specifications, and contract and the plans and profiles in connection therewith, and that they are wholly familiar with the same; that they have visited the work concerned and agree that they are wholly familiar with the character and amount of the work left uncompleted and what remains to be completed by the defendant as surety; that they have also inspected the plant and materials of said Orman & Crook so taken into possession by the government and are wholly familiar with the character and condition of the plant and material. It contained a provision for the extension of time as to one branch of the work; that the aggregate agreed price for all the work to be paid by Orman & Crook for completion thereof is $1,003,299.25, upon which there had been paid to Orman & Crook $310,111.91, leaving as balance on the contract price $693,187.34 yet to be paid by the United States of America for the completion of the work, in which balance is included the amount of $45,000 (designated as hold-backs) and penalties charged against Or-

man & Crook of $7,050 for failure to complete certain portions of the work within the contract time, but which penalties the defendant was advised may thereafter be remitted by the United States of America and paid to the defendant additional to the estimates for completed work when the whole work has been completed. (The terms "hold-backs" and "penalties" are explained later.) That the plaintiffs have agreed with the defendant to complete the whole of the work left uncompleted upon the terms and conditions thereinafter in said contract stated. These terms and conditions are substantially as follows:

The plaintiffs agree to promptly and diligently complete the work within a certain time and in the manner and pursuant to the terms and conditions in the Orman & Crook contract and in accordance with the requirements of the specifications, plans, and profiles, and to pay for all material, labor, and supplies furnished, used, or necessary in, upon, or about said work purchased by the plaintiffs hereto, and to discharge any attachments or liens that may be filed by any one furnishing the plaintiffs with such materials, labor, and supplies.

"The moneys to be paid the contractors [the plaintiffs] therefor shall be the sum or balance to be paid by the United States of America under the contract of Orman & Crook, and which sum or balance is understood to be $641,137.34, to which is to be added and paid by the United States of America the hold-backs on schedules 1 and 2 as above set forth, aggregating $45,000, and penalties aggregating $7,050; and the further sum of $14,050 to be paid by the company to the contractors as hereinafter set forth."

Article II of the contract is as follows:

"The contractors shall have the use of the plant, horses, mules, and materials of Orman & Crook taken into possession by the secretary upon the suspension of the contract of Orman & Crook, as aforesaid, an inventory of which is now or may be hereafter annexed, marked schedule 'A,' the contractors at the completion of the work herein agreed to be

done, or upon the default by the contractors, resulting in the further suspension of the contract by the United States of America, or the company, to return at the place where received, the plant, horses, mules, and the materials, if any there be left, to the company in as good condition as reasonable wear and tear occurring in the progress of the work will permit. The company agrees that the contractors shall have the use of said property without charge during the progress of said work and until completion thereof, and will protect and defend the contractor against a superior claim on the part of any other person affecting the possession of any of said property."

By the third article the plaintiffs agreed to furnish to the defendant, on or before April 10, 1908, a bond for $90,000 conditioned for the faithful performance of the contract by the plaintiffs.

By the fourth article the defendant agreed to procure from the United States of America the right to the plaintiffs to the use without charge of the said plant, horses and mules, and materials of Orman & Crook taken into possession upon suspension of the contract of Orman & Crook, until completion of the work, and to procure an extension of time for the completion of a portion of such work.

Article V is as follows:

"The company agrees to assign all warrants and to pay over to the contractors all money received by the company from the United States of America upon estimates of work done by the contractors under said contract of Orman & Crook, and to assign all warrants and to pay over all moneys received by the company from the United States of America for hold-backs on schedules 1 and 2 and for penalties charged against Orman & Crook as aforesaid, within five days after such warrants or payments or any of them shall have been received by the company, and, in addition thereto, the company agrees to pay the contractors the sum of fourteen thousand and fifty (14,050) dollars, and no more, which latter sum shall be in full for all other obligations and liabilities of the company to the contractors, seven thousand dollars

($7,000) thereof on or before May 20, 1908, and the balance, seven thousand and fifty (7,050) dollars, on or before October 20, 1908."

In article VI it was agreed that the plaintiffs undertook no liability for material or labor claims unpaid by said Orman & Crook.

By article VII provisions were made in case of failure on the part of the plaintiffs to carry on the work.

Articles VIII and IX were with reference to conditions not material here.

Articles X, XI, and XII are as follows:

"X. This contract shall be subject to all the terms of the specifications and of the contract of Orman & Crook hereto annexed and to the plans and profiles on file in the office of the United States reclamation service relating to said work herein agreed to be done, it being the true intent of the parties hereto that the contractors shall be bound thereby for the completion of the uncompleted work, aforesaid, in the same manner as if they had been the contractors with the United States of America in the place of Orman & Crook, and said contractors shall look to the payments to be made by the United States of America for their compensation for all work done hereunder, and the company shall not be liable to the contractors for any greater sum than fourteen thousand and fifty (14,050) dollars, as aforesaid, except as hereinbefore expressly agreed.

"XI. Should the United States of America fail or refuse to enter into contract with the company on or before April 10, 1908, for the completion of said work as herein agreed, including provision for the use by the company of the plant, the extending of the time for the completion of schedule 1 to December 1, 1910, and for the payment of forty-five thousand (45,000) dollars hold-back hereinafter referred to upon the completion of said contract, and waiving any forfeiture thereof to the said United States and upon the same terms as to prices for the uncompleted work as provided in the contract of Orman & Crook, this contract shall immediately cease and become null and void.

"XII. The company agrees to furnish to the contractors on

or before April 10, 1908, a copy of the contract entered into between the United States of America and the company for the completion of the work hereinbefore referred to."

Among the specifications in the original contract of Orman & Crook and made a part of the contract before us it was provided that in case of any contingency such as did in fact arise, the secretary of the interior shall have the power to suspend the operation of the contract and may have possession of all material, tools, appliances, and animals employed on any of the works to be constructed under the contract and of all materials belonging to the contractor delivered on the grounds, and may use the same to complete the work or may employ others to carry the contract to completion, substitute their machinery or material or purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, and animals at the contractors' expense as may be necessary for the proper conduct of the work and for finishing it in the time agreed upon.

Specification No. 38 of the Orman & Crook contract was as follows:

"38. *Payments.* The payments due shall be made to the contractor upon the presentation of proper accounts, prepared by the engineer and approved by the chief engineer, in accordance with the provisions made therefor and pertaining to the contract. When the work has been completed or all the material has been delivered, to the satisfaction of the chief engineer, and when a release of all claims against the United States on account of the contract shall have been executed by the contractor, final payment of the balance due will be made."

By specification No. 103 provision was made for a deduction of $50 per day from the amount due on the contract for each of the different schedules or divisions of the work for each and every day the work remains uncompleted, as liquidated damages for loss to the United States on account of such delay. This sum will include the value to the United States

of the use of the work as well as the cost of engineering, superintendence, etc. The $7,050 designated as penalties under the foregoing contract between the parties was assessed and held back under this paragraph 103.

A further provision as to estimates and payments is found in paragraph No. 104 of such specifications and is as follows:

"104. *Estimates and payments.* Payments will be made as follows: At the end of each calendar month the engineer shall make an approximate measurement of all the work done or materials delivered up to that date, and an estimate of the value of the same, at the prices agreed upon in the contract. A deduction of twenty per cent. shall be made from this estimated amount, and from the balance shall be deducted the amount of all previous payments. The remainder shall be paid to the contractor upon the presentation of proper accounts, prepared by the engineer and approved by the chief engineer. The twenty per cent. so deducted shall be retained by the government until the work shall have been completed to the entire satisfaction of the chief engineer, and in case of default by the contractor said twenty per cent. shall be and become the sole and absolute property of the United States. In the case of schedule No. 1, after the amount so retained equals $40,000 the contractor shall be paid the full value of the work done or the materials delivered during each month, and in the case of each of schedules Nos. 2 and 3, after the amount retained equals $5,000 the foregoing deduction of twenty per cent. shall no longer be made, but the contractor shall be paid the full value of the work done or materials delivered during each month. The balance due upon completion of the contract shall be paid as provided in paragraph 38."

The $45,000 designated as hold-backs in the foregoing contract is what is referred to in this paragraph 104 (and is ultimately determined by the government to be the sum of $44,768.22 and so found by the court below).

After the signing of the contract on April 2d the vice-president and counsel of the defendant, a Mr. Griffin, who appeared to have acted for defendant all through these pro-

ceedings, proceeded to Washington to arrange for the obtaining of the contract between the defendant and the government for the carrying on of the work, and on April 6th he telegraphed from Washington to plaintiffs at Janesville as follows:

"*National Surety Co.* to Hayes Brothers Co. at Janesville. On Orman & Crook work government agrees upon completion of contract the retained percentage under paragraph one hundred four of specifications shall subject to provisions of Orman & Crook contract be paid to proper party in interest. Other requirements agreed to wire your approval how soon will you deliver bond answer."

To this the plaintiffs replied on the same day as follows:

"Hayes Bros. to *National Surety Co.* at New York. We stand on our contract and insist that we be assured payment of hold-back be made to you and by you assigned to us, or that you guarantee same. Bond ready."

On April 8th Griffin sent two telegrams from Washington of substantially the same import, one reading as follows:

"Griffin to Hayes Bros. Co. at Janesville. Government agrees to payment hold-back to company and other requirements. Mail your bond to company New York immediately wiring name of surety company copy contract between government and company mailed today."

On April 8th a contract was made between the defendant and the United States government, the latter acting through the Honorable James R. Garfield, secretary of the interior, and which is hereinafter designated as the Garfield contract. It referred to the contract of November, 1905, between Orman & Crook and the United States for the doing of the work, that the time for completing certain of the work was extended to December 1, 1910, and that the defendant should be allowed the use without charge of all machinery, tools, appliances, and animals taken over by the United States under the Orman & Crook contract, and that in consideration of performance by the defendant it shall be paid upon the

presentation of proper accounts prepared by the engineer and approved by the chief engineer as provided in paragraphs 38 and 104 of the specifications of the 1905 contract; and further provided:

"Upon completion of the contract the percentage heretofore retained under the provisions of paragraph 104 of the specifications shall, subject to the provisions of the said contract of November 14, 1905, be paid to the proper party in interest, viz. the party of the second part," *i. e.* the defendant.

It also provided, under the requirements of sec. 3737, R. S. of U. S., that neither the contract nor any interest therein shall be transferred to any other party or parties and that any such transfer shall cause the annulment of the contract so far as the United States is concerned.

There was no provision in this contract with the government by which it agreed to pay the so-called penalties of $7,050.

On April 10th a registry receipt was signed by the bookkeeper of the plaintiffs at Janesville for a letter claimed by defendant to have contained a copy of this Garfield contract.

The plaintiffs left Janesville on the evening of April 11th for the work, and after some delay subsequent to their arrival there had possession of the work and of the property then held and used by the government turned over to them about April 21st. They proceeded with said work and about June 1st notified defendant that claim had been made by one Mark Young to a portion of the property, including horses, mules, and certain materials or supplies which had been received by plaintiffs from the government on April 21st. Considerable negotiations were had between the parties with reference to that claim, as is more particularly set forth in the opinion.

The work was substantially completed about the 1st of July, 1911.

Itemized monthly statements were sent to plaintiffs by the United States government and postal-card notices of the monthly amounts also mailed to defendant until about September, 1909, when a change of method was instituted and thereafter the estimates or statements were also sent to defendant, and forwarded by it to plaintiffs, upon which payments were made by the United States government from time to time to defendant as the work progressed, and as made to it forwarded to plaintiffs. On each of such statements appeared an item showing a deduction of $4,594.87 for materials and supplies. On December 21, 1911, a so-called final estimate was made on behalf of the government. Whether the same was at that time mailed to the defendant was in dispute between the parties. After considerable correspondence between the parties and complaint on the part of the plaintiffs of delay in the payment finally due under this contract, a copy of this estimate was received in July, 1913, by defendant, sent by it to plaintiffs, and by them returned to defendant, who executed a final release as required by the government and sent the same to the proper officials. Subsequently, upon an opinion of the comptroller of the treasury, the government refused to pay to defendant the so-called hold-backs, claiming that the same should properly belong, under the Orman & Crook contract, to the trustee in bankruptcy for Orman & Crook in the bankruptcy proceedings at Denver, Colorado, of that firm; and further notifying defendant that unless some other disposition were made by agreement with such trustee or by legal proceedings, such payment would be made to the trustee in February, 1914.

Before that date a conference was had between the parties hereto and their respective counsel, and thereafter suit was brought in the district court of the District of Columbia making the proper government officials parties as well as the trustee in bankruptcy, and the result thereof is more particularly referred to in the opinion.

This action was commenced December 3, 1913. Several supplementary answers were interposed and postponements had of the trial of said cause from time to time. After proceedings had been taken by the Hayes Brothers Company to dissolve and the death of the individual plaintiff, the action was revived or continued in the name of the present plaintiff, the administratrix of the deceased, John W. Peters. A plea in abatement was interposed, more particularly treated of in the opinion.

At the close of the trial the court determined that the contract between the parties created an absolute liability on the part of defendant to pay to plaintiffs the amount that is mentioned in their contract as being due from the United States to Orman & Crook, giving the defendant a reasonable time before payment to receive the money from the United States. He awarded damages in accordance with such determination for principal and interest, which, with the costs and disbursements of $114.28, totaled $87,473.45. The items thereof, for convenience of reference hereinafter, were substantially as follows:

1. $7,050, being the so-called penalties under the Orman & Crook contract;

2. Interest on that sum from December 21, 1911;

3. $4,469.47, the so-called Young claim;

4. Interest on that amount on various items thereof, starting from August 26, 1908, the time of the purchase of the Young claim;

5. $4,594.87, the so-called government deduction for materials and supplies purchased by the government and used in carrying on the work or turned over to plaintiffs April 21, 1908;

6. Interest on that sum from September 30, 1908, the date of the first statement by the government;

7. $44,768.22, so-called hold-backs, being the amount referred to in the contract as $45,000;

8. Interest on said sum from December 21, 1911, to entry of judgment;

9. Interest from December 21, 1911, to August 28, 1914,

on $24,860.08, amount allowed in final settlement and paid over to plaintiff August 28, 1914.

Defendant appealed to this court from such judgment upon appropriate exceptions being taken.

For the appellant there were briefs by *Miller, Mack & Fairchild,* and oral argument by *J. G. Hardgrove,* all of Milwaukee.

For the respondent there was a brief by *Charles E. Pierce* and *Jeffris, Mouat, Oestreich & Avery* of Janesville, and oral argument by *Mr. Pierce, Mr. O. A. Oestreich,* and *Mr. M. G. Jeffris.*

The following opinion was filed January 5, 1918:

Eschweiler, J.   Probably much of the complication and long delays that have arisen in this litigation may be ascribed to the fact that each of the parties to the contract of April 2, 1908, from the first time any question arose thereunder, seemingly took diametrically opposed views as to their respective rights and liabilities.   The trial court adopted the plaintiffs' view, namely, that there was an absolute liability under that contract to pay to plaintiffs the amount mentioned therein on account of the work, without regard to the fact as to whether the United States government paid such amount for the same work or not.   In coming to this conclusion much reliance was placed upon language found in paragraph I of the contract reading as follows:

"The moneys to be paid the contractors therefor shall be the sum or balance to be paid by the United States of America under the contract of Orman & Crook aforesaid, and which sum or balance is understood to be $641,137.34, to which is to be added and paid by the United States of America the hold-backs on schedules 1 and 2 as above set forth, aggregating $45,000, and penalties aggregating $7,050, and the further sum of $14,050 to be paid by the company to the contractors as hereinafter set forth."

From this language it is argued that there was assumed

by the defendant an absolute liability to the full extent of the gross amount mentioned therein, together with the hold-backs of $45,000, the penalties of $7,050, and the further sum of $14,050. There are, however, other provisions in the contract which must be considered in order to arrive at the legal effect of the instrument.

By paragraph V the defendant agreed to assign all warrants and pay over to plaintiffs all moneys received by it from the United States upon estimates of work done under the contract of Orman & Crook and to assign all warrants and pay over all moneys received by the defendant from the United States for hold-backs and for penalties charged against Orman & Crook, within five days after such warrants or payments, or any of them, shall have been received by the defendant, and in addition thereto the defendant agreed to pay the plaintiffs $14,050 and no more, which latter sum shall be in full for all other obligations and liabilities of the defendant to the plaintiffs; and there is further in paragraph X very significant language to the effect that it is the true intent of the parties that the plaintiffs shall be bound for the completion of the uncompleted work in the same manner as if they had been the contractors with the United States instead of Orman & Crook, and that said plaintiffs shall look to the payments to be made by the United States for their compensation for all work done under such contract, and the company shall not be liable to the contractors for any greater sum than $14,050, except as was thereinbefore expressly agreed.

From the four corners of this instrument we construe it as fixing an absolute liability on the part of the defendant to pay the sum of $14,050; that the compensation for doing the work should be all the moneys that should be paid out by the United States government for or on account of the work required by it in order to complete the Belle Fourche project; that each party was under an implied obligation to as-

sist, wherever necessary, in taking the required steps to obtain from the government the amount that the government was willing to pay for the work as it went on or which should finally become due on the completion of the work; that it was incumbent upon the defendant to use reasonable diligence to collect from the government the sums of money that became due from the government to it under the Garfield contract, and then to assign the warrants or pay over the amounts within five days after the same should have been so collected by reasonable diligence from the government.     Neither party had the right to sit back and insist that it was incumbent upon the other party to take all the steps necessary to obtain from the government the moneys for such work.

The defendant was not, as it contends, a mere trustee for the plaintiffs or a mere conduit through which the money was to pass from the government to the plaintiffs, nor were the plaintiffs mere assignees of the Garfield contract, because an assignment of such a contract is absolutely prohibited by sec. 6890, U. S. Comp. Stats., and neither party can be heard to assert that there was in effect such an assignment, for what cannot be permitted to be done directly will not be permitted to be done indirectly.

The United States government obligated itself, under the Garfield contract, to pay defendant, not the plaintiffs, and the defendant was the only one in position to demand the money for the work done.     It either had the absolute duty to pay the whole amount due for the work or the implied duty to see to it that the work was paid for in such amount as the United States government should allow.     It could not occupy the reputed position of Mahomet's coffin.

Were authorities necessary to sustain this construction of defendant's obligation they are at hand.     *Rumsey v. Livers,* 112 Md. 546, 77 Atl. 295; *Vermont M. Co. v. Mann,* 36 Vt. 697; *White v. Snell,* 9 Pick. (26 Mass.) 16.

We are not unmindful of the contentions made by the parties with respect to the telegram of April 6th and the two telegrams of April 8, 1908, from Mr. Griffin at Washington on behalf of defendant to plaintiffs, to the effect that the government agreed to the payment of the "hold-backs" and "other requirements," and from which latter expression it is insisted by plaintiffs that they were entitled to consider that the requirement as to the payment of the penalties of $7,050 had also been agreed to by the United States government. But we feel that the consideration of the language of these telegrams is immaterial in the disposition of this case, for the reason that although the court below found that the Garfield contract of April 10th was received by plaintiffs after October 10th, yet it stands uncontradicted in the testimony that a letter purporting to contain a copy of the Garfield contract was sent by defendant to plaintiffs and the return receipt for such registered letter signed by the then bookkeeper of the plaintiffs at Janesville at about noon of April 10th. The bookkeeper whose signature appeared on such receipt was not called as a witness and the plaintiffs did not leave Janesville for the work until the evening of April 11th. That importance was attached to the plaintiffs having a copy of the Garfield contract is evidenced by article XII of the contract of April 2d, which required defendant to furnish such copy on or before April 10th.

We are satisfied that it must be considered as a verity in this case and any finding to the contrary deemed modified, that the plaintiffs did receive on April 10, 1908, and have in their possession from then on, the so-called Garfield contract of April 8th between the defendant and the government, and are chargeable with knowledge of its contents, and cannot be heard to say that they relied upon the language in these telegrams which might have led them to a different understanding as to the contents of such contract, and especially when they retained it without protest on the score of any in-

consistency between the face of the Garfield contract and any such understanding.

As to the item of $7,050, the so-called penalties withheld by the United States government from Orman & Crook under their contract, the following are verities in the case: That by the Garfield contract the United States government did promise and agree to pay to defendant the hold-backs of $45,000, but did not agree to pay these penalties; during the progress of the work, in the monthly statements from September, 1908, until June, 1911, and in the final estimate of December 21, 1911, there is no suggestion or intimation on the part of the government that it intended to change the position it had assumed under the Garfield contract with reference to these penalties; under such a situation the remission of such penalties would have been a favor on the part of the government to either the defendant or the plaintiffs and not a matter of contract right; the plaintiffs at no time prior to the final settlement between the government and the defendant under the Garfield contract directed, suggested, or demanded that the defendant should require such a favor from the government; the time within which the defendant could properly request such favor was before the acceptance of the final estimate of December 21, 1911.

Considering these verities in the light of the construction that we have adopted of the contract between the parties, we can see no ground upon which the plaintiffs' claim for these penalties can be allowed, and neither of the grounds upon which plaintiffs contend for a liability can be sustained; the first, namely, on the theory of an absolute liability of defendant, because we have determined that that was not the effect of the contract; or secondly, that the defendant, having made no effort to collect the same from the government, cannot be heard to say that it could not have collected them if such attempt had been made. This second contention is disposed of adversely to plaintiffs because, the matter of pen-

alties being one of favor and not of contract, it was as much incumbent upon the plaintiffs to ask for such favor after the Garfield contract was brought to their attention as it was on the part of the defendant, and the plaintiffs having permitted that opportunity to go by without such application on their part, either directly or through defendant, plaintiffs cannot now hold defendant on the speculative theory that such a favor might have been granted if some one had asked for it.

It is true that in the testimony of Mr. Griffin with reference to the conference had between representatives of the parties as to the bringing of the suit in the district court of Columbia he testified that he mentioned there that such suit was to determine the question of the penalties as well as the payment of the hold-backs, but there was subsequently sent to the plaintiffs a written statement as to the nature of the Washington suit in which the penalties are not mentioned, and furthermore they and their counsel are chargeable with knowledge that a claim of such a nature as would be one for these penalties would have to be brought in the court of claims and not in the district court of the District of Columbia, the former court alone having jurisdiction over amounts for which the government had denied liability, as would be the case for these penalties.

The item allowed by the trial court of $4,469.47 is designated the Young claim because it is the balance or net cost to the plaintiffs arising from a transaction between them and one Young, who asserted title to considerable of the property which had been used on the work by Orman & Crook and left there by them in January, 1908. The government took possession of all such property, including the horses, supplies, tools, and materials, by virtue of the provisions of the contract with Orman & Crook, and continued to use the same in the prosecuting of the work during the interval between January and April 21, 1908.

By the Garfield contract the government permitted the

defendant to have the possession and use of such property. By the contract between the parties hereto the defendant agreed in paragraph II that the plaintiffs should have the use of the plant, horses, mules, and materials of Orman & Crook taken into possession by the secretary as aforesaid, and provided that an inventory thereof might thereafter be annexed to the contract. The defendant also agreed that the contractors should have the use of said property without charge during the progress of said work, and that it would protect and defend the plaintiffs against a superior claim on the part of any other person affecting the possession of any of said property.

No inventory was ever attached to the contract, according to the above provision. One had been made on February 1st, but plaintiffs testify that they did not see that one. Another was made April 21st at the time the supplies and materials were turned over by the government officials to the plaintiffs. The plaintiffs testified as to this inventory that they would not accept it for the reason that all the property was not turned over to them. Defendant's testimony was that it knew nothing of this inventory until long after the work was completed. In this inventory there was a statement to the effect that certain equipment was claimed and probably owned by Mark Young and that it was not included in the preceding part of the inventory of the Orman & Crook property, but is turned over to plaintiffs by order of the director of the United States government service.

About June 1, 1908, the plaintiffs notified defendant that Young was now claiming the ownership of this property and insisting on its delivery to him or compensation for it, and they also asserted that to be deprived of the property at that stage of the work would seriously incommode its prosecution.

During the first stages of the controversy concerning this claim of Young's, plaintiffs notified defendant that there

was a serious doubt as to Young's ownership and that he was probably a partner instead of being an employee of Orman & Crook, and the government at first took the stand that it would through the United States district attorney defend against any claim of Young. Subsequently the government refused to take any part in the controversy, and plaintiffs notified defendant that they were satisfied from the proceedings that had been taken in Denver in the bankruptcy of Orman & Crook and the adjudication there made that Young, as a matter of fact, owned this property, and suggested to the defendant that it and the plaintiffs should join in purchasing the property from Young. Defendant then took the position and maintained the same thereafter that it was under no obligation towards the plaintiffs with reference to this claim of Young and that they must protect themselves, and refused to participate in any proposed purchase of the claim of Young.

Thereupon the plaintiffs purchased for about $7,000 this property of Young and continued to use the same on the work. Thereafter they sold certain portions thereof in such manner that the net cost to them became the amount that was allowed by the court of $4,469.47. This purchase from Young was finally closed on August 26, 1908, and it was from that date that the court allowed interest on this balance.

It is contended in opposition to the allowance of this item that from the language of the inventory of April 21st, made at the time the property was turned over to the plaintiffs, they were bound to know from the recital that this was not the property of Orman & Crook, but was claimed by and probably owned by Mark Young, and that therefore, when they accepted the same with such notice, they could not charge the defendant with any liability on account thereof; or again, that the contract must be construed as guaranteeing to plaintiffs possession and use of and freedom from su-

perior claims only as to property actually owned by Orman & Crook and did not apply to or cover property which, although it might have been in the possession of the government and turned over to the plaintiffs, as a matter of fact was not owned by Orman & Crook; or lastly, that, plaintiffs having failed to give defendant an opportunity to defend by litigation against the claim of Young to this property and having settled with Young themselves without such litigation, the defendant cannot be held.

We are satisfied from a consideration of the testimony that none of these objections is tenable and that the findings of fact of the trial court upon which the allowance of this item is based are supported and should stand. The contract, it is true, is somewhat indefinite as to whether or not it was intended to cover property simply owned by Orman & Crook or property that was in the possession of and used by Orman & Crook in the carrying on of the work. Whatever doubt might have been in the language of the contract, it was proper for the court to solve it by the aid of the evidence presented at the trial, and there is sufficient support in that evidence to warrant the court in coming to the solution that it did.

There is no question but that this property was actually on the work and had been used by Orman & Crook and, after their departure, by the government in the actual prosecution of the work. It was necessary for such work and might well be held to have been within the letter and the spirit of the contract.

The defendant in effect elected to stand upon its own construction of the contract and deny responsibility in any manner for this Young controversy. Having so elected, it is bound by such election, and could not in the face of that stand require the plaintiffs to go through the useless formality of tendering to defendant the defense of any lawsuit between plaintiffs and Young.

The first statement or estimate appearing in the record from the United States government for the doing of the work after the plaintiffs commenced in April, 1908, was dated September 30th. On such statement or estimate was an item of deduction from the amount to be paid for such work of $4,594.87 under the designation "Supplies and materials purchased by U. S. and turned over to *National Surety Company.*" Subsequently it identifies it as estimate No. 5, which is in the nature of a bill October 1, 1908, for materials and supplies purchased by the United States upon suspension of Orman & Crook contract, for use in connection with the work covered by said contract and turned over to the *National Surety Company* on April 21, 1908. Of this bill about $246.21 was for lumber, harness, hardware, and other materials, and the balance of $4,348.68 was for hay, ice, coal, potatoes, and other food supplies. It was found by the court below, and there is evidence to support it, that the United States from time to time consumed part of the materials and supplies on hand when they took the plant over in January, 1908, and it even supplied other materials and supplies, and that all such were used in connection with and as a part of the plant and were upon the work when the contract between the parties was made, and that both parties assumed that such supplies and materials were a part of such plant; that the amount of such item was deducted by the government under the Garfield contract; that such deduction was never consented to by plaintiffs, and that such claim of the United States was and is a superior claim against the property turned over to the plaintiffs by the government such as is mentioned in paragraph II of the contract.

Defendant's objections to the allowance of this claim are substantially, first, that it was not covered by the contract between the parties and is not a claim or lien against the property; and secondly, that if it should be such a lien, the

deduction was acquiesced in without objection by the plaintiffs and that they therefore must be held to have waived, as against the defendant, any claim for such item. It was as much due to the failure of the defendant as of the plaintiffs to see to it, that the proper inventory as to the property intended to be covered under defendant's guaranty of quiet possession in the contract was not made and attached to the contract, for such an inventory might easily have solved all doubtful questions which have arisen on this subject. In default of such inventory the court below must necessarily have resort to evidence to determine from all the surrounding circumstances and the situation of the parties what was intended to be covered by the contract. From such consideration the court arrived at the conclusion that this property, as well as that claimed by Young, was intended to be made secure in the possession of the plaintiffs for the prosecution of the work, and we cannot disturb such findings.

While there is much force in the contention of the appellant that the plaintiffs waived their claim as to this matter by the acquiescence of the plaintiffs in the deduction during the time the government was sending in monthly estimates from September, 1908, until June, 1911, and in the final estimate of December 21, 1911, yet it does not necessarily follow that, as a matter of law, such tacit acquiescence in the deduction so far as the government was concerned in its dealings under the Garfield contract, to which, of course, the plaintiffs were not parties, amounted to a waiver of their claim as against the defendant under their separate contract. Manifestly a final adjustment of affairs between the plaintiffs and the defendant could not be expected to be determined until at least the adjustment with the government under the Garfield contract had been disposed of, and before that was done by the defendant this present action had been commenced.

There is a further substantial ground to support the find-

ings and conclusion of the trial court as to both of these pre-
ceding items, namely, the so-called Young claim and the gov-
ernment deduction.   That is founded upon the unqualified
admission of a liability as to both of these items, although
not as to the full amount thereof, that was made by the vice-
president and counsel, Mr. Griffin, in February, 1914, and
during the progress of the trial of this action.

A conference was had in Chicago with reference to the
situation then present, arising under the contention of the
government that the hold-backs should be paid to the trustee
in bankruptcy for Orman & Crook and not to the defendant.
At that time the situation as to these two other items was
discussed, and in consideration of an extension of time for
the trial of the present lawsuit, then pending, it was agreed
that an investigation should be made into the plaintiffs'
claims for this Young item and the government deduction
item, and information was furnished by plaintiffs to defend-
ant for such examination.   A further extension of time was
requested for the investigation of these claims and such ex-
tension granted, and thereafter the vice-president of defend-
ant caused checks to be drawn, one for $3,763.04 on the
Young claim, and another for $246.21 on the government
deduction item, and sent the same to defendant's counsel at
Milwaukee, notifying plaintiffs' counsel, by two communi-
cations, that the defendant was satisfied that there was a
liability of the defendant for these two items and to the
amount evidenced by these two checks.   After these checks
reached Milwaukee defendant's counsel there took a differ-
ent view of the situation and advised the defendant that a
liability for the same did not exist, and for that reason the
checks were never delivered.

Such admission of liability, after full opportunity for
examination and consideration, is of great weight and would
be amply sufficient to support these findings of the court.
Having admitted the obligation as to each of these items,

the defendant cannot limit it to the exact amount which it conceded it was willing to pay on those two items.

It is urged by defendant that under the contract nothing was due or payable until the engineer's certificate had been obtained by the plaintiffs and presented to or filed with the United States government, but from the view we have taken of the rights and liabilities of the parties to this contract we do not consider that such is a material question in the case. Such certificate was only necessary as between the government and the defendant under the Garfield contract, and the duty to obtain it rested primarily upon the defendant. Such a provision was to protect the United States government and not the defendant, and although the plaintiffs were to stand in the shoes of Orman & Crook under the original contract, yet plaintiffs' obligations under that contract would be to the government and not to defendant. The defendant, especially where it has continually repudiated any obligation to be an active agent in securing the money from the government, is in no position, under the contract of April 2d, to insist on any such condition being performed on the part of plaintiffs.

Again, the defendant urges that, since it appeared that after the work was completed certain claims were made against the plaintiffs for alleged balances due to subcontractors or others employed on the work, therefore until such claims had been satisfied and discharged plaintiffs could not maintain this action. Reliance for such position is placed upon the provision in article I of the contract of April 2d by which plaintiffs agreed to pay for all materials, labor, and supplies furnished, used, or necessary in said work, and to discharge any attachments or liens that might be filed by any person furnishing such materials, labor, and supplies. The answer to this contention is that such action on the part of plaintiffs is not expressly made a condition precedent to its receiving the money from the government, nor is it one by implication; the defendant had ample security by withholding funds sufficient to cover such claims, or requiring such

claimants to be made parties hereto. And lastly, as found by the trial court in its fourteenth finding, the defendant never based its refusal to act upon either the failure of plaintiffs to obtain such releases or the engineer's certificate.

The estimate of December 21, 1911, or so-called final estimate, was not forwarded by defendant to plaintiffs until July 19, 1913, and it was then returned by them to the defendant, which on October 24th sent the final estimate, with the necessary release executed by it, to the government officials having charge of the work and accounts in this matter. The comptroller of the treasury rendered an opinion November 11, 1913, in substance advising that the payments of the hold-backs could not safely be made to any other than the trustee in bankruptcy of the firm of Orman & Crook, and suggesting the advisability of some suit being instituted to determine to whom such fund could safely be paid. Thereupon the defendant was notified that unless steps were taken requiring some other disposition thereof, the government would, in February, 1914, pay such hold-backs to such trustee in bankruptcy of Orman & Crook. Thereupon, after consultation with plaintiffs and their counsel, defendant instituted a suit in its own name in the district court of the District of Columbia making the proper government officials parties thereto as well as the trustee in bankruptcy. During the pendency of such action the government paid the item of $24,860.08 which was paid over to plaintiffs on August 28, 1914. An adverse decision was made on the hearing of said action in the district court as to the other item of hold-backs and an appeal taken by defendant, and on the appeal a final judgment rendered determining that the payment of the hold-backs could properly be made, as provided in the Garfield contract, to defendant, and, such judgment being complied with by the government, the amount so received was turned over to defendant and held by it to be disposed of subject to the decision of the court on the plea in abatement.

In the prosecution of such lawsuit the defendant incurred

expenses amounting to about $3,400 and claims that it should be allowed such sum as in the nature of a counterclaim against the plaintiffs, again relying in support of such claim upon the position it had planted itself upon with reference to the contract, namely, that any steps that defendant took to obtain this money from the government to be paid over to the plaintiffs were in the nature of a favor and not an obligation, and that, having brought this suit and obtained the money, it should be reimbursed its expenses.

Under the view of the contract that we have deemed it right to take, the bringing of this lawsuit in order to obtain the money from the government was one of the implied obligations that the defendant assumed towards the plaintiffs, and it was merely doing what it ought to do under its contract of April 2d, and the trial court was therefore correct in disallowing this amount.

The contract of April 2, 1908, was made by defendant on one side and by Hayes Brothers Company, a Janesville corporation, and John W. Peters, on the other. The corporation filed a certificate of dissolution in February, 1913, with the secretary of state, and no question is raised but that such certificate was regular, sufficient under the statute, and properly filed. By sec. 1764, Stats., it is provided that after such dissolution such corporation shall nevertheless continue to be a body corporate for three years thereafter for the purpose of prosecuting and defending actions and enabling it to settle and close up its business, dispose of and convey its property, and divide its capital stock, and for no other purpose.

After the three-year period expired John W. Peters died, and the present plaintiff, *Mary Kathryn Peters,* was appointed administratrix of his estate and substituted in his stead as a party plaintiff.

The defendant now suggests as a difficulty, without offering any solution or remedy for such, first, that a partnership

cannot be formed between a corporation and an individual, and that therefore there was no such joint interest in this contract that upon the dissolution of the corporation it became the property of the individual who survived; and second, that there is no one to whom in safety to itself it can pay the amount due for the completion of the work, which it concedes it still holds, belonging to some one else than itself.

The defendant, however, elected to enter into this contract with the two entities, the corporation and an individual, and is not in a position now to contend that such a contract could not be properly made. The corporation by its own hand in February, 1913, died, and by virtue of the statute above quoted became dead beyond all probability, if not all possibility, of resurrection in February, 1916. Whatever rights it may have had in and to this fund, not having been disposed of by any action on its part at the time of such death, necessarily passed to someone or somewhere, but certainly did not revert to the defendant. No other resting place is suggested for this fund by the parties and none occurs to us other than the person also interested in the contract who survived, namely, Mr. Peters, and we hold, therefore, that under the record in this case whatever interest and ownership there was in the funds here in question passed on the death of the corporation, as it would have on the death of an individual copartner, to the surviving partner, so far at least as the defendant in this action is concerned, and that the present plaintiff, the administratrix of the estate of Peters, is the proper person to whom payment may be made, and the plea in abatement was properly overruled.

Interest was allowed by the court below on the various items of damages for which judgment was directed. From December 21, 1911, on the hold-backs of $44,768.22 to the date of the entry of judgment, and on the item of $24,860.08, the amount for the final work, to August 28, 1914, the date when such sum was paid over to plaintiffs.

As to these two items we think that that date is fixed at least thirty days too early, because under the contract as we have construed it the defendant's obligation was to take the necessary steps to collect the amounts due under the Garfield contract from the government and pay them to the plaintiffs, yet that would necessarily involve a reasonable time for the government officials to check over and approve of any such final estimate.

It appears that about thirty days was the time taken, from October 24, 1913, to November 22, 1913, after the final release was signed by the defendant and returned to the government, before the government took action warranting the disbursement of these amounts; that would seem to be a reasonable time, and the obligation to pay would therefore not rest upon defendant until after such time had passed and would bring the period for the running of the interest as to these two items embraced in the final estimate of December 21, 1911, up to January 21, 1912, and the judgment should be modified accordingly.

We do not overlook the fact that by the fifteenth finding the trial court found that the time between July 1 and December 21, 1911, was a reasonable time within which the defendant could and should have taken the necessary steps to collect from the government the amounts due for this work. There is no evidence, however, that any of the delay between the preceding government estimate of June, 1911, and the final estimate of December 21, 1911, was due to any delinquency on the part of the defendant or that such interval was unreasonable in view of the nature of the work and all the other circumstances, or that such was not the regular routine for such accounts to take. It was a very large project, costing over a million dollars, and some time must necessarily elapse between the time of the actual completion of such work and the time when the government could safely say that it was ready to make its final estimate. In the ab-

sence of showing to the contrary, it is presumed that the final estimate was made by the government with reasonable dispatch. The filing, therefore, of this final estimate on December 21, 1911, as a public record, so to speak, was the date at which defendant's activities should begin, and, as we have just seen, thirty days from that date a reasonable time from which its liability as to interest should begin.

The allowance of interest on the Young claim from August 26, 1908, is proper and will not be changed.

The question of interest on the government deduction of $4,594.87, which item first appears in the government estimate of September 30, 1908, brings up the oft discussed questions of when interest should be allowed in contract actions, and, when allowed, from what time. The confusion that has often arisen on such subject is fully shown in the discussion on the subject in the case of *Laycock v. Parker,* 103 Wis. 161, 178, 189, 79 N. W. 327.

In some cases for breach of contract and some sounding in tort a sum is allowed equivalent in amount to interest, not as interest, but simply as compensation for the delay, in order that the plaintiff may be fully remunerated. *J. I. Case P. Works v. Niles & Scott Co.* 107 Wis. 9, 17, 82 N. W. 568.

Such a rule has been especially recognized in actions for injury to property. *Voigt v. Milwaukee Co.* 158 Wis. 666, 149 N. W. 392; *Bagnall v. Milwaukee,* 156 Wis. 642, 649, 146 N. W. 791.

But in many actions for breach of contract, where the contract itself does not expressly provide for interest, a demand for payment may be necessary in order to fix the period from which interest is ultimately to be computed. And in the absence of other form of demand the commencement of the action is treated as such demand. *Laycock v. Parker,* 103 Wis. 161, 188, 79 N. W. 327. Or, as is stated in the case of *State v. Milwaukee,* 158 Wis. 564, 573, 149 N. W. 579,

where no time of payment is fixed in the contract, or where the claim is unliquidated, or where the question of liability is so involved in doubt that there are reasonable grounds for believing that no liability exists, a demand is, in the absence of peculiar equitable considerations, necessary to set interest running.

It is alleged in the complaint that demands were made before the commencement of the action for these various items, and issue was raised on this allegation by the general denial in the answer. We find no evidence in the record of anything in the nature of a demand for this particular item having been made prior to the commencement of this action. In the eleventh finding of fact, which concerns this item, it is declared that this deduction was made without the consent of plaintiffs; that they have not been paid, and that it was a superior claim; but no finding is made as to any demand for such sum by plaintiffs on defendant. It was deducted September, 1908, at the time the government made its first estimate under the Garfield contract, and appeared as a deduction through all succeeding monthly estimates as well as in the final estimate of December 21, 1911. The amounts were received by the defendant and turned over to the plaintiffs without any exception being taken by plaintiffs at the respective times as to this item.

The language of the item, namely, "Supplies and material purchased by U. S. and turned over to *National Surety Company,*" did not necessarily, as a matter of law, notify the defendant that such deduction was a superior claim against the property turned over to plaintiffs for which it must be responsible under the second clause of the contract, or that it must forthwith pay such sum to the plaintiffs in order to avoid liability. Under the nature of the transaction between the parties, it may well be said that the situation here is governed by the rule laid down in *Ryan D. Co. v. Hvambsahl,* 92 Wis. 62, 65 N. W. 873. In the absence of a prior

demand, therefore, the commencement of this action December 3, 1913, must be considered the date from which interest on this item shall be computed.

In thus disposing of all the questions before us that are deemed material, it follows that the judgment below must be modified so that it shall provide for damages as of the date of the entry of judgment July 10, 1917, as follows:

|  | Principal. | Interest. |
|---|---|---|
| Young claim _____ | $4,469 47 | |
| Interest on this item as specified in findings $1,447.91, plus interest on $4,469.47 August 25, 1912, to judgment, of $1,307.35; total on this _____ | | $2,755 26 |
| Government deduction _____ | 4,594 87 | |
| Interest from December 3, 1913, to July 10, 1917 _____ | | 993 18 |
| Interest on $24,860.08 from January 21, 1912, to date of payment, August 28, 1914_____ | | 3,882 28 |
| Hold-backs _____ | 44,768 22 | |
| Interest thereon from January 21, 1912, to July 10, 1917 _____ | | 14,684 70 |
| Totals _____ | $53,832 56 | $22,315 42 |
| Total principal _____ | | $53,832 56 |
| Total interest _____ | | 22,315 42 |
| Total _____ | | $76,147 98 |
| Costs in circuit court _____ | | 114 28 |
| Grand total _____ | | $76,262 26 |

—instead of the sum of $87,473.45 as therein entered.

*By the Court.*—The judgment of the circuit court is modified to provide for the allowance of $53,832.56 as principal, $22,315.42 as interest, and $114.28 costs and disbursements, making a total of $76,262.26, and as so modified it is affirmed as of July 10, 1917; appellant to have its costs and disbursements in this court.

A motion for a rehearing was denied, with $25 costs, on April 3, 1918.

The following opinion was filed May 2, 1918:

ESCHWEILER, J. (*dissenting*). I must dissent from the order denying the motion for a rehearing because a re-exam-

ination of the record herein convinces me, as I now freely, though perhaps not cheerfully, admit that it was improper to allow interest, as was done in the decision, amounting to $7,619.36 on two separate items involved in the lawsuit in Washington, D. C., and for periods of time between February 28, 1914, when that action was started, and August 28, 1914, and October 6, 1916, respectively.

At the time of the making of the so-called Garfield contract in April, 1908, between defendant and the government the question was raised by the reclamation bureau as to whether, under the situation then existing, sums then withheld under the contract with Orman & Crook could ultimately be properly paid to the defendant as against the trustee in bankruptcy of those original contractors. At that time the question was examined and passed upon by an assistant attorney general of the United States whose finding was approved by ·the secretary of the interior, to the effect that such payments might be properly made to the defendant as against the trustee in bankruptcy.

In November, 1913, the comptroller of the treasury rendered a decision holding just the opposite to the position taken in 1908. This change necessitated the .bringing of a lawsuit in Washington in which the trustee in bankruptcy was made a party in order to determine that very question. As a result of this lawsuit, which, it is conceded, was prosecuted with due diligence, the original position of the government in 1908 was upheld and the later position under which payment was delayed declared untenable.

Interest is allowed in this case by way of damages only. Under such a situation I think the period during which the question was necessarily litigated in Washington owing to this changed position of the government was a period during which interest on the sums there involved could not be properly charged against the defendant. It neither had the use of the money nor did it receive interest from the govern-

ment for such delay. *Burr v. Comm.* 212 Mass. 534, 537, 99 N. E. 328; 22 Cyc. 1558; 15 Ruling Case Law, 34; *Rennell v. Kimball,* 87 Mass. 356, 367; *McDonald v. Loewen,* 145 Mo. App. 49, 130 S. W. 52.

Again, I think it cannot be properly held that such a radical change of position by the government as to such payment was within the field of reasonable contemplation of the parties to this litigation at the time the contract between them was made. For a breach of contract such damages only are allowable as are within the field of reasonable contemplation. *Lommen v. Danaher,* 165 Wis. 15, 19, 161 N. W. 15; *Lloyd Inv. Co. v. Ill. S. Co.* 164 Wis. 282, 289, 160 N. W. 58; *Nelson v. Goddard & Co.* 162 Wis. 66, 71, 155 N. W. 943.

KERWIN, J., concurs in the foregoing dissent.

OWEN, J., took no part.